SCHOOL DISTRICT No. 2 IN BRENTWOOD *v.* POLLARD. { Aug. 12, 1875.

The minor children of paupers, supported at a county poor-farm, have the right to attend the public school in the district in which such county farm is located.

The parties agreed to the following statement of facts :

The plaintiffs are a school district in the town of Brentwood, duly authorized, and on the thirtieth day of September, A. D. 1874, and for a long time previous, owned the lot and school-house thereon described in the writ in said action, and occupied them for school purposes. The defendant at said time was the superintendent of the county farm for said county, which is located within the limits of said school district. During the time named in said writ, Charles Osgood, William Cronan, Katie Wright, William Johnson, and Etta Johnson resided upon and were supported at said county farm as county paupers. They were minor children, and their parents resided upon and were supported at said county farm as county paupers. Neither said children nor their parents had any residence or domicile in said district other than their residence at said county farm as county paupers. On or about the first of August, A. D. 1874, the plaintiffs, by their prudential committee duly authorized, forbade said children entering said school-house and attending school there ; but by the order of said defendant said children continued to go into said school-house and attend school there, up to the thirtieth day of September, 1874.

The foregoing facts were agreed to for the purpose of determining the question whether or not said children had a lawful right to attend the school, kept in said school-house in said district, against the will of said district and its prudential committee ; and it was agreed that such judgment should be entered up thereon as the court might order,—judgment to be given for the plaintiffs for nominal damages and costs, if the court should be of opinion that said children had no right to attend said school, upon the facts above stated.

*Wiggin & Fernald,* for the plaintiffs, cited Gen. Stats., ch. 83, sec. 18, *ib.,* ch. 1, sec. 6, 2 Bouv. Law Dict. 470, *Thorndike* v. *Boston,* 1 Met. 242, *Shattuck v. Maynard,* 3 N. H. 123, *Moore* v *Wilkins,* 10 N. H. 452, *Kirkland* v. *Whately,* 4 Allen 462, and *Whitney* v. *Sherburn,* 12 Allen 111.

*Frink,* for the defendant.

*FOSTER, C. J., C. C.    No person shall have a right to attend school, or to send any scholar to the school, in any district of which he not an inhabitant, without the consent of the district or of the prudential committee. Gen. Stats., ch. 83, sec. 1.

---

* SMITH, J., did not sit.

This provision includes and limits all the exception which our laws permit to the enjoyment of the rights and privileges of free, popular education. These rights and advantages are not peculiar to any condition of mind, body, or estate. No previous length of residence in the school district is required, provided the scholar, when he goes to the school, is rightfully and properly inhabiting the district. His residence there for the purpose of schooling is not the residence declared essential for taxation, or the exercise of the right of suffrage.

Neither is the scholar or his parent required to possess a property qualification. If the poor man or the poor child behaves himself honestly and uprightly, the state owes him the services of a schoolmaster; and it taxes the property of its more favored children in order to pay this debt. Herein the municipal law is but an exemplification of the law of Christian charity.

Although the alms-house itself is exempted from taxation (Laws of 1869, ch. 37), the county poor-farm in Brentwood is thus taxed for the support of education in school district No. 2. Gen. Stats., ch. 49, sec. 2. And although it may happen, by reason of the number of children temporarily dwelling upon the poor-farm, that the county may not always pay its equitable proportion of the school tax, still *ita lex scripta est;* and if a grievance therefore exists, its remedy must be sought at the doors of the legislature, and cannot be applied by the court.

The question is, whether these children, dwelling for the present within the limits of this school district because their poverty but not their will consents, are to be regarded as inhabitants of the district, within the meaning of the school laws.

It has been decided in this state, that a person who is temporarily and fraudulently located in a district for the sole purpose of acquiring an education there, in preference to enjoying the advantages of a similar condition in the place of his actual residence, is not an inhabitant of the district within the meaning of the law. *School District* v. *Bragdon,* 23 N. H. 507.

I am not aware of any other judicial interpretation of the statute; but it was suggested by the court, in *McIntire* v. *Pembroke,* 53 N. H. 467, that persons afflicted with an infectious disease, and who in consequence thereof may be removed to a pest-house, while thus secluded from their friends and under municipal control, may, perhaps, be in a temporary condition of pauperism, and entitled to medical aid at the expense of the town: there seems to be an analogy between such a case and the present.

It is not the ordinary law of domicile, as affected by the *animus manendi* or the *animus revertendi*, which is to govern this case.

Who, then, is an inhabitant of a school district, in the legal sense?

He need not be a *resident* of the district. The word *inhabit* is derived from the Latin verb *habito,* which is defined, " to dwell, to abide, to inhabit, or live in." *Reside* is from *re* and *sedeo,* " to sit down; " and *dwell,* from the Danish *dwelger,* " to abide."

All these terms are usually classed as synonymes, but not, in strict-

ness, properly so; for the word *inhabit* does not convey the idea of permanent residence.   To dwell, or to abide, does not indicate permanency of location or of time,—for the angels abode with Lot one night, and the Arabs dwell in tents ; but, they

> "fold their tents *like the Arabs,*
> And as silently steal away."

*Inhabit* conveys the idea of a home, but not necessarily of a full and fixed settlement, such as is conveyed by the term residence ; for Dr. Johnson tells us, " being obliged to remove my *habitation,* I was led by my evil genius to a convenient house in the street where the nobility *reside* "—precisely the condition, it would seem, of these unfortunate children of the public.  The statutory definition of the term inhabitant —Gen. Stats., ch. 1, sec. 6—is not very important, but it is ambiguous and uncertain.  " The word inhabitant *may* mean [not shall be] a resident, or person dwelling and having his home, in any city, town, or place."

A person's *home* may be his own house, or his hired lodgings. Webster's Dic.

It need not be denied, that, while a person is actually residing in one place with the intention of remaining there, or with no intention of returning to his former residence, he is not, in any commonly received sense, an inhabitant of the latter for the purposes of taxation.   The case from 1 Metcalf, cited by the learned counsel for the plaintiff, decides no more than this.   If it bears any analogy to the present case, it does not help the plaintiffs.   If the fathers of these children, instead of being temporarily inhabitants of the poor-farm, against their will, perhaps, and with no definite intention of returning to their former place and condition of life, have in fact taken up their abode in the alms-house as a permanent residence, they are inhabitants of the district, and not the less inhabitants because residents.

It need not be denied that there may be authority and power vested in the county commissioners to establish a school within the limits of the county farm, for the special uses and necessities of the children located there ; but the law does not *require* it, and the commissioners have not done it ; and if these children are denied the privileges of schooling in the district school, they are denied altogether.   They are in as woeful plight as Wordsworth's sorrow-burdened " traveller on the skirt of Sarum's plain : "

> "And homeless near a thousand homes he stood,
> And near a thousand tables pined and wanted food."

In the earliest days of the government, more than a century and a quarter before the framers of our present state constitution prescribed " the duty of the legislators and magistrates, in all future periods of this government, to cherish the interests of literature and the sciences, and all seminaries and public schools,—declaring that " knowledge and learning, generally diffused through a community," are " essential to the preservation of a free government,"—the town of Dover, " at a

VOL. LV.     32

publique Towne Meetinge held the 5 : 2 mo. 58," voted that "Twenty pounds per annum shall be yearly rayzed for the mayntenance of a School master &ast; &ast; that is to say, for the teachings of *all the children* within the Township."

New Hampshire was not an independent colony then, and the laws of the province of Massachusetts imposed a penalty of £10 upon every town of one hundred families and upwards that should "neglect or omitt to keepe a grammer schoole." 1 N. H. Prov. Pap. 234. The good men of Dover gave this practical interpretation of the law : this " grammer schoole," so costly in the days when £10 was a great sum, is for " all the children " in Dover.

Since those early days, there has not only been no condition imposed restricting the privileges of a public school education to any class, sect, or condition, political or social, but every child, almost as soon as he can speak his native tongue, is permitted, if not required, to attend school in the district which he inhabits (no length of time being prescribed for his previous residence therein) ; and, since his education is thus assured at the public expense, he is prohibited from entering into certain employments of life until and unless he shall have, through his own moral and mental discipline and culture, contributed something to the preservation of a free government. Gen. Stats., ch. 83, secs. 11–13.

In this city of Concord, all the pauper children attend school in the common school-house of the district in which the almshouse is located. All the children of the Orphans' Home at Franklin are provided for in the same way; and neither in these nor any other instances, prior to the present suit, am I aware that the rights of the children in this respect have ever been questioned.

Counsel for the plaintiffs apprehend danger to the health, the manners, and the morals of the more fortunate children from "association with such a class as make up the larger share of county paupers." I apprehend this is a groundless fear. An enlightened community will not tolerate, on the part of the guardians of the poor, such negligence or inhumanity as would tend to the generation, promotion, or dissemination of infectious disease. And it is to be hoped that a condition of vice is not an ordinary inference from the condition of poverty.

It was a maxim of the late emperor of the French, that the first duty of a charitable administration is to prevent the need of charity ; but the greatest preventive of pauperism,—that is to say, popular education,—has not yet been introduced into France. The influences of free institutions, general suffrage, and popular education are essential to the cultivation of individual respect and independence. These influences cure and eradicate pauperism; for " whatever elevates the political and social condition of the poor and laboring man, or sharpens his faculties, or improves his character, or strengthens his capacity for self-control, in so far tends to prevent the peculiar debasement, dependence, and misery which constitute pauperism." The children of the more fortunate classes may become degraded by contact with the dependent and

idle poor, if no restraint is imposed upon the latter and upon free association ; but, under the combined discipline of the work-house and the school, there can be no great danger of contamination from the vice or misfortune which is undergoing the process of curative treatment.

However this may be, it is contrary to the policy of our institutions to exclude from the advantages of free schooling those whom misfortune has cast upon the public charity.   That charity will continue to dipense not bread alone, but, without distinction of person, the blessings of moral culture and the means of mental illumination, even as God pours his sunbeams alike upon the just and the unjust.

CUSHING, C. J.    The case turns upon the construction of the word " inhabitant," in Gen. Stats., ch. 83, sec. 1.   In *School District* v. *Bragdon*, 23 N. H. 510, the court charged the jury, amongst other matters, " that, ordinarily, actual residence was all that was required to entitle persons of suitable age to attend the school."   This charge received the approbation of the whole court, and must be considered as authority for the construction of Rev. Stats., ch. 73, sec. 7, which is in these words: "No person shall have a right to send to or to receive any benefit from any school in a district in which he is not a resident, without the consent of such district."   In Gen. Stats., ch. 83, sec. 1, the word " inhabitant " takes the place of the word " resident " in the Revised Statutes.   In the report of the commissioners of 1867, they indicated by the letter *v* in the margin that their changes were merely verbal.   It is true that the legislature, in enacting the General Statutes, added, after the words " consent of the district," the words " or of the prudential committee," which is a material alteration, but leaves the alteration before made as the commissioners left it,—merely verbal.

By Gen. Stats., ch. 1, sec. 6, " the word ' inhabitant' may mean a resident or person dwelling and having his home in any city, town, or place."   It would seem, therefore, that the construction given to the word " resident," in the case above cited, would apply equally to the word " inhabitant " of the present statute.

It appears from the case, that these poor children did attend the school from the first of August to the end of September, during all which time we must understand that all the home they had was the county poor-farm.   It is undoubtedly the policy of the law of this state, that poor children, so situated, should have the benefit of the public provisions for instruction.   I think the fact that they were inmates of the county poor-house during all the time, and that they had no home or domicile anywhere else, is sufficient to make them residents and inhabitants within the meaning of the law.   I therefore fully agree with my brother FOSTER, that there must be judgment for the defendant.

LADD, J.    I also think these children are inhabitants of the district, within the meaning of Gen. Stats., ch. 83, sec 1, and that our judgment should be for the defendant.

                                   *Judgment for the defendant.*